Case number 22-5305. S. Stanley Young, Dr. and Louis Anthony Cox, Jr., Dr. Appellants v. Environmental Protection Agency, et al. Mr. Shumate for the Appellants. Mr. Busa for the Appellants. Good morning, Your Honors. May it please the Court. Brett Shumate on behalf of Dr. Young. This case involves an extreme example of an agency violating the Fair Balance Requirement in the Federal Advisory Committee Act. Two years ago at the beginning of the current administration, EPA fired all seven members of an advisory committee that had previously recommended against strengthening the national air quality standards. A few months later, EPA then selected new committee members, but they all share the same view. The air quality standards should be strengthened. Earlier this year, EPA proposed a new rule strengthening the air quality standards on the basis of the new committee's unanimous recommendation to do exactly that. This case is the flip side. Positions for Social Responsibility v. Wheeler, which the Court decided three years ago. In that case, EPA tried to exclude grant holders from serving on the committee. In this case, EPA stacked the committee with grant holders while excluding anyone who might share the industry's perspective that the air quality standards are adequate and should not be strengthened. EPA complied with the Fair Balance Requirement in this case, but nothing would stop the next administration from doing the inverse of what EPA did here by firing the entire committee and establishing a new committee, stacking it with scientists made by oil and gas companies, all of whom agree that the air quality standards should be relaxed, not strengthened. Before I get into our Fair Balance claim, I'd like to actually start with our EPA claim, because everything that the government says in this case about fair balance is post hoc rational. Could I just ask you to start briefly with a question about standing? I know the government hasn't directly addressed your reliance on these equal protection cases, but we'll hear from them. But one potential distinction, it seems to me, is that in those cases it's very clear that the law provides an individual right to be considered free from discrimination, whether that's from the Constitution or a statute. And at least it's not immediately clear that the FACA confers the same type of individual rights to be fairly considered. And I'm just wondering how you'd encourage us to think about that potential distinction. My first response is the defense circuit has already addressed this question. Obviously the court's not bound by that, but if you agree with the government, there would be a direct conflict between this court and the Tenth Circuit, the Colorado Environmental Coalition. But I think the theory of standing has been well established in Bakke and in this circuit in the Shea case that whenever there's a denial of a fair opportunity because the government acts illegally, it doesn't matter what the illegality is, there's an Article 3 injury that a court can address. And so a theory of injury here is that our the committee because EPA violated their balance requirement and they decided to give a preference to individuals who support stronger air quality standards. If you set aside and require EPA to redo the selection and include someone who has an opposing viewpoint, it would create additional seats on the committee for one of our. Basically if they follow the law, your clients would have a better chance at getting on the committee and that should be enough. Correct, that should be enough. There is no personal right to a seat on the committee, I acknowledge that, but that's not our argument. It's not, you know, a university applicant doesn't have a personal right to admission at the university, but they still have standing to challenge an affirmative action program. Thank you, I understand the argument, so please proceed as you were as you were about to. So with the individuals, both of these plaintiffs were competing, they were among the 100 candidates. That's correct, Your Honor, they were one of the hundred that were nominated for a seat on the committee. Our theory of standing is that they did not have a fair opportunity to compete because the government gave a preference to individuals who support it. The decision document put together by the staff and recommending who the the EPA administrator should select said nothing about viewpoint. That's correct, Your Honor. How do you know that that your clients were not given a fair opportunity because of their viewpoint and in fact the small bios of the hundred people don't mention their viewpoint? Your Honor, for purposes of standing you have to assume that we're correct on the merits, that we've alleged a violation of the fair balance requirement and assuming the truth of that allegation, then the government did violate the law and violated the fair balance requirement and had a preference for individuals strong who supported stronger air quality standards. So on our on our allegation under the merits, which we have to assume to be true, they were denied a fair opportunity because the government violated the fair balance. How you could possibly prove that in light of the Supreme Court decisions in the Morgan cases? Are you familiar with them? I don't think I am, Your Honor. Okay, there's four of them and the the ones that bear on this question are Morgan 2 and Morgan 4 and the Supreme Court held that you cannot, as a private litigant, explore the mental processes of the decision-maker in an agency. So I don't know how you go about proving that the selection was such that it depended upon the viewpoint. You'd have to, you know, look at the mental processes of the EPA administrator, which you can't do. Your Honor, I do know of those Morgan cases and I think those are APA review cases where, fair point, when you're reviewing the agency's decision on the merits, you don't evaluate the decision-maker. But here, for purposes of our APA claim, we're not saying you need to evaluate their subjective mental processes or anything like that. Just review the agency's explanation. It is inadequate under the APA because the administrator did not provide a reasoned explanation of why he believes this committee is fairly balanced in terms of viewpoints. If you look at the staff decision memos, all they did was check the fair balance box. They never explained themselves. So we're not arguing here that you need to look into anything in the administrator's mind because he did provide an explanation. It's at page 21 of the joint appendix where he announced these individuals are going to serve on the committee, they have these qualifications, but he never addresses the one factor that Congress directed him to consider, which is fair balance. Neither did the staff. In fact, what's I think essential here is that, yes, in the decision memo, the underlying decision memos, the staff never even explained to the administrator why they believe the candidates that they recommended would establish a fairly balanced committee. Again, that's the one factor that Congress deemed relevant to establishing a new committee, it's fair balance. And the staff didn't even consider the GSA regulations or EPA's handbook, which provide factors and guidelines to consider when establishing a fairly balanced committee. So you don't need to look into the mental processes for purposes of our APA claim, you only need to look at the explanation in the record, which is woefully inadequate. What if they're fairly balanced with respect to CO2 emissions, but not fairly balanced with respect to particulate control? This committee is the clean air committee, which is responsible for all the pollutants across the board. That's right, your honor. I think that would be a harder case for me, but I think here the facts are so extreme, where we know the agency fired the previous committee, which in 2019 had recommended, again, strengthening the air quality standards for particulate matter, in part because the president on day one directed EPA to reconsider that particular rule that was firing happened in March of 2021. And then in June of 2021, EPA established the new committee. It's mostly made up of grant holders, who EPA would have known what their research is on air quality issues, particulate matter. I think it would be a harder case for me if the administration... There is a particulate matter committee, too. Actually, there are two of them, right? There is a particulate matter subcommittee that is formed out of this advisory committee, but there's not a separate... The chairman of them has to be a member of the air quality or the clean air committee, but what about the membership of the particulate matter committee? That is not considered an advisory committee, so it's something that the chair of the committee can establish. I believe all members of the seven members serve on the subcommittee, but they can expand it, so I think there were a dozen or more individuals who served on the particulate matter review committee. Our plaintiffs were not selected... This committee is by statute? Correct. The Clean Air Act requires EPA to establish this committee. I think what's essential about this committee, and distinguishes it from many other advisory committees, is that this committee has an essential role in the policymaking and rulemaking process, because Congress charged this committee with recommending to the administrator changes to the air quality standards. That's in Section 7409 D2B of the Clean Air Act. Can I ask a question about your evidence and what your theory is on fair balance? So, it seems to me that what you focused on is, as some of the questions have suggested, is views on the particulate matter standard. Not every standard the agency is going to apply, and it would seem a little bit odd to me if what we were asked, telling EPA to do, when they're filling a seven-member committee, is basically to go through every issue this committee is going to work on, and make sure you have somebody who currently has a different view on that issue. I don't really see how that's administrable. So, is that, am I misunderstanding the rule you'd have us adopt here? A couple responses. I don't want the administrator to explain himself. So, that's our EPA claim. The administrator didn't explain why he believes this committee would be fairly balanced. In terms of our fair balance claim, I think the way to assess fair balance starts with the GSA regulations. We say, you look at the committee's mandate, and you look at, does the committee have a divergent points of view on the issues before the committee? So, this committee's mandate is to look at the air quality standards writ large, and advise the administrator on whether they're adequate or not. So, a policy judgment. So, you know. The proxy you want us to use for, is there a array of viewpoints on the matters to be studied, is for the agency to go out and find out what each individual person thinks. And maybe, I'll sharpen this up a little bit, because throughout your briefs, you say you needed somebody on the committee who had the viewpoint that stronger regulations, on particular matter, were unnecessary. But they had that. They appointed Dr. Boylan, who said in December 2019, that he did not support strengthening those particular standards. And as I understand it, you come back and say, well, you didn't know how committed he was to that. And again, just goes back to the fundamental point, we did this analysis the way you're asking the committee, not only do they have to figure out in advance, what everyone's going to think, you got to make sure they're not going to change their mind. Is that that was sort of my takeaway from your reply brief on this point. So, with respect to Dr. Boylan, I don't think you can count him as the person who would represent the industry's point of view that air quality standards are adequate, for at least two reasons. Number one, he's a state regulator, he represents the viewpoint of regulators, which would be the public at large consumers. And he supported stronger air quality standards in this round of review. So he was part of the unanimous recommendation. And in 2019, he just found flaws in the underlying risk assessment. He didn't come out and say, look, I, you know, I would, I would never support stronger air quality. Yeah, that's what I want to understand. You're saying the problem is that you said, based on the current evidence, I don't support strengthening the air quality standards. And instead, EPA had to find somebody without an open mind. Or is there another way to thread that needle? EPA knew that they were posing viewpoints on this particular issue. And the reason why I'm focusing on a particular matter because that is because that was the issue that was teed up for the EPA. Initially, it's the most apparent why there's a violation of the fair balance requirement. EPA knew exactly what it was doing in this round, because it wanted a new recommendation from the committee that would support reconsidering the rule that had been adopted at the end of the prior administration. It knew there was an opposing viewpoint, at least with respect to a particular matter. We don't know if there were different views on the other air quality standards. And EPA likely knew, because it was funding the research of the academics that it appointed to the committee, that if it would appoint those individuals, it would get a different outcome. Yes, the he's the state official, he's a state regulator. And ultimately, he supported strengthening the air quality standards. So if you look at full record, there was no opposing viewpoint on this particular issue. Just one last question on the on the fair balance point. It does seem to me that a much more reasonable way to get industry viewpoint on a committee would be to have an industry representative. Then you wouldn't have to poll the audience on what they think about every single issue, which strikes me as a bit odd when you've got a scientific committee that's, their job is to study the issue and arrive at an opinion, right? And it seems you've conceded for very good reasons. This statute, when you read it in conjunction with 7409, doesn't require an industry representative. So I think my question is essentially, if Congress wanted to make sure one of these seven members was an industry viewpoint, isn't the natural way they would have done that to have an industry representative? No, you're I see my time is up to answer your question. No, and our argument is not that there must be an industry seat on the committee. Our argument focuses on viewpoint balance, that there needs to be an opposing viewpoint and have a one sided echo chamber issue before the committee. And the reason why I'm focused on industry is because industry is the group that was championing championing opposition to stronger air quality standards. So even though this particular statute doesn't say you need to have an industry rep or an industry seat, but in addition to the other three, EPA still has to comply with the fair balance requirement among the seven selected for the committee, and they needed an opposing viewpoint. What they got was a committee that all supported stronger air quality standards, and that violates the fair balance. In light of microbiological, do you think we are at liberty to hold that this is a non justiciable question? No, you're and I think microbiological is controlling. I understand it's on the jurors on the jurisdiction. Just issue building on review ability, which is not jurisdictional in this court. But I understand that the complicated issue and there are persuasive opinions from Dutch Edwards Silverman. I think the better case is physicians for social responsibility. The reason why is because that case established a binding holding in this court that FACA regulations promulgated by GSA provide law to apply. Was it focused on the point of view? Fairly balanced inquiry, or did it go in a different direction? It was not. That was an ethics issue. And so the court looked to part A of GSA FACA regulations. Part B are the fair balance guidelines, which obviously are different than part A. They established different things. But the fact that there are GSA regulations that provide more detailed guidelines for an agency to follow when establishing a fairly balanced committee that we put those out in page 75 of our appendix. That is the law that can be applied. And I think physicians for social responsibility is obviously binding and makes clear that that is law that can be applied in a different way. I see a question from the district court opinion in physicians for social responsibility. Judge McFadden asks, suppose that the court could divine committee members, scientific and policy views and sought to balance membership between members who represent plaintiff's views with members who represent opposed. How would the court determine whether the views of a particular committee member are close enough to those plaintiffs to find them representatives? And then he quotes Judge Silverman. Would the court rule, for instance, that when two parties agree on a certain percentage, what percentage, of issues, which issues, one may be deemed representative of the other? I think those are very persuasive points. I think Judge Silverman is persuasive. However, Judge McFadden got reversed on that issue in physicians for social responsibility on the reviewability point. On whether the ethics was reviewable, but not whether the question before us is that's right. But I think the GSA regulations provide the missing link that Judge Silverman was looking for in microbiological and that Judge McFadden was referring to, which is Judge Silverman's complaint was, how am I supposed to decide what are the relevant points of view? It could be infinite, right? But he also said, if somebody could narrow for me it down to two or three relevant points of view, that might be a different case and he might find it reviewable. GSA regulations, which were promulgated in 2001 after microbiological. Again, they're on page 75 of my brief. They talk about several factors that an agency must consider in establishing a fairly balanced committee. You start with the mission of the committee and then you look to the types of perspectives required. For example, those of consumers, technical experts, public at large, academia, business, or other sectors. And then I think this is the key one. The need to obtain divergent points of view on the issues before the advisory. Here, the issues before ASAC, whether the air quality standards are adequate or whether they should be changed. There are two opposing viewpoints on that issue. You know that from the 2019 recommendation that said they're adequate. There's only two? At least two. But there might be infinite. It might be infinite, but that's why they're... Just take one of the words we mentioned, consumer viewpoint. I mean, the consumers, I don't know if we agree on everything. That was Judge Silverman's point. Why is that wrong? Well, I think the GSA regulations constrain the agency's discretion quite a bit and point the agency to what to look at by clarifying what points of view are relevant. It's not all the many issues that might come before the committee. It is what are the issues before the committee according to the mandate. We know what the mandate is here. It's clear in section 7409 and the charter on page 7 of the Joint Appendix makes clear it's about policy. Should the rules be strengthened? And, you know, maybe there are more than two, but the GSA regulations identify the types of perspectives the agency should look at to see, well, whether they have different points of view. But on any rulemaking issue, there are typically going to be two different camps. Should the rules be stronger or should they not be strong? And in this case, I think there's a status quo. Should we keep the status quo? Should we increase regulations by a little? Should we increase them by a lot? Should we decrease them by a little? Should we decrease them by a lot? And there's a spectrum from one extreme to the other that probably has, again, an infinite number of possible positions. That may be true, but there's really a binary question at the beginning, which is, are the rules adequate? And there was unanimity on this committee that the rules are not adequate. Yes, the standard could be raised to an infinite number of levels, but there was an exclusion of the opposing viewpoint that the current rules are adequate. So, at a minimum, in extreme cases, a fair balance standard provides law to apply, and this is an extreme case. Let me ask one in the weeds question and then one big picture question. Do you know if the defendants in microbiological at the district court filed 12B1 or 12B6? Were they arguing merits or were they arguing? That I don't know, but I think what you're getting at is whether reviewability is jurisdictional. I'm trying to figure out what the district court did there. Did the district court say, this is non-reviewable, which the last paragraph in microbiological suggests, or did the district court say, I'm dismissing because this is fairly balanced, and then the appellate court did what we did? I don't know. I know the circuit opinions were talking about justiciability. Yeah, and then kind of taking one step back, this, you know, fair balancing requirement that Congress has imposed, do you think that it's constitutional in the first place for Congress to tell the president who he's allowed to get advice from, who he has to get advice from? It's a great question. I don't know the answer to that. Obviously not brief. I don't know, Your Honor. I mean, typically the president can get advice from whoever he wants. That is, Congress can't constrain his ability to remove federal... You did here, and you seem to object to it. President? The administration said we want advice from these people. Put them on the advisory committee, and you say, no, no, that's illegal. Congress enacted the statute to constrain the administrator's discretion and Congress's discretion, not the president's. The administrator works for the president. He does, and we're not complaining about the administrator's firing in March of 2021. We've raised no claim to challenge the firing. We're just challenging the composition of the new committee. So I don't think this case presents that president's removal power. In this case, this is a case about compliance with a statutory requirement to ensure good scientific advice is provided to the agency. In this case, the agency rigged the science to get the result they wanted because the president wanted to change the rule. Apologies, one more question. Just of many things that are difficult about this statute, in this discussion, I think we've assumed that points of view represented means the views of individuals on specific issues to be studied. I'm just wondering, how do we know that? Couldn't it also mean points of view in terms of their expertise or even who they're affiliated with? It says points of view represented, after all. So maybe it means you think about, is there someone from an environmental group and from industry? How do we know that it's, we should read it the way you want us to read it? I think it's a great question and then I have two responses. And I think this is mainly the government's point and the district court's point that, but two responses are, one statute is this chunk says functional balance and viewpoint balance. Then you got to tell me what functional means. So function means do we have the right type of people with the qualifications to perform the work of the committee? And so this committee, you know, putting lawyers and novelists on this committee probably wouldn't be a functionally balanced committee because I'm not qualified to do the work of the committee. But scientists and different types of experts are. So that's what functional balance is trying to accomplish. Viewpoint balance is trying to accomplish. Well, what are their points of view? And I think, again, the GSA regulations are very helpful in describing at least what GSA thinks viewpoint balance means. It's points of, divergent points of view on the issues before the committee. So that's talking about what are their, you know, how do they approach the issue? What are their opinions? And here we know what the different points of view are because EPA tried to exclude. Thank you. Thank you. Good morning, and may it please the court. Joseph Busa on behalf of the government. The standard I heard my friend on the other side offer in response to this court's questions this morning is unworkable, contrary to the statute, and we should win on the merits under any applicable standard. I just want to start by clearing up some misconceptions about about who's on the committee and what the committee has done so far. Dr. Boylan has dissented on six different standards that have been reviewed so far. I can list them off. That's the PM 2.5 primary 24-hour standard, the PM 2.5 secondary 24-hour standard, the sulfur oxide secondary standards, the nitrogen oxide secondary standards, the ozone primary standards, and the ozone secondary standards. And that's just so far, and that's entirely predictable. You know, if someone were trying to figure out what is Dr. Boylan going to do on the committee, what does he think in general on these issues? In 2021, when the EPA administrator was appointing this committee, the best data point was his most recent vote, not further tighten the PM 2.5 standards. So just to begin with, even on their standard, we should win. But I want to highlight how extraordinary it would be to require the  advisory committee to somehow make a predictive judgment about what all 100 candidates would do if they were faced with all 17 ambient air quality standards, and then try to assemble a group of seven people that maximally disagree with each other on all of those issues. That's nearly an impossible task, and it's one that's antithetical to the statute. This is a scientific advisory committee. The whole point of the committee is to review evolving science, discuss the topics with each other, bring to bear their individual points of view, and I'm sorry, I see you have a question. I don't quite understand the distinction between, in this context, an EPA scientific committee and an EPA policy committee. They're making policy recommendations, right? I have to disagree with you on that, Your Honor. The statute says that you set ambient air quality standards at the level that is requisite to protect public health or the public welfare. That's guidance on what the policy should be, and they make recommendations on what the policy should be. I'm not saying that the policy is just picked from thin air without any consideration of science, but I mean, the EPA is a policy-making... Your Honor, wait a sec, they're recommending... Regulation-making administration. So the question would be something like, look, is a level of 8 micrograms per square meter over a 24-hour period the level that is human body that kick in earlier than that, that we need to know about? That's the work of the committee. I mean, if you review... Yeah, it sounds like a policy question. Should the policy be 8 micro... whatever. But you start out by saying it would just be extraordinary to do this, and I'm sympathetic to that, but I mean, maybe it's an extraordinary statute. It strikes me as a pretty extraordinary statute. So, with respect, the statute here requires scientific perspectives. It's an independent scientific advisory committee that tells you the perspectives you're looking for are scientific perspectives, not ultimate conclusions on all 17 ambient air quality standards. The work of this committee... If it was all science, and this has nothing to do with policy, why did the administration make the major change to the committee that it made? Oh, so the administrator explained this. It's in the record. We explained it in our brief. The committee that this administrator faced when coming into office was chosen under very unusual circumstances, under a brand-new policy that had never been applied in the APA history, and the grant recipient issue, a policy that was later enjoined and then received. I'm sorry, your honor. You think that that committee was full of bad scientists? No. So, why did it need to change it? Also, because... Again, they didn't like the method by which they were selected, but if it's just a scientific committee, and they weren't bad scientists, then why not keep them? There is nothing unusual about an agency head coming into office and saying, I want to apply our traditional standards that we've always applied, not the standards that were recently enjoined by the Southern District of New York. There's nothing unusual about that at all. And then if you just look at the process that they ran, it is by the book and ensures a fair balance of all the scientific perspectives. So they say, thank you for your service, please reapply, because we need different scientific perspectives. They assemble a hundred candidates, evaluate them on the basis of their scientific expertise. They say in their solicitation for nominations, we need the following perspectives to be fairly balanced, and they list all of those scientific perspectives. What they don't need at that early stage in the process is, we need people willing to raise their hand right now and say, before reviewing any of the evolving scientific evidence, the package that this committee actually reviews when it comes to this issue, we need to pre-commit to, you know, what you think should happen with every single one of the standards. I think I asked Mr. Shumate this as well, but what do you think is the binding holding coming out of microbiological with regard to the justiciability question? There is none. I think that's pretty clear. I mean, so you have Judge Edwards in dissent reaching the justiciability question. You have Judge Silverman concurring, reaching the issue, but they both disagree with each other. No holding there. Judge Friedman doesn't address the issue. Well, I don't think he addresses it expressly, but he says this committee is fairly balanced, which seems like you can't say it is fairly balanced unless the question of whether it's fairly balanced is a question that can be answered. So I disagree. I think I have two lines of response, Your Honor. The first is just, it is beyond clear that when a court reaches a decision on the merits without addressing a threshold issue, that does not stand for a holding that that the threshold issue that was not raised is, like, precluded as a matter of precedent. This is just an application of that principle. Secondly, every human being can have their own view of what they would do with a fair balancing requirement if they were going to appoint a committee. And yes, you can ask everyone on the planet to try to figure that out with respect to any given committee. That's not the question Heckler asks. I think I'm probably on board, but imagine that I think Judge Friedman's opinion is best read to say it is justiciable. Judge Silverman's is, of course, read to say that it's not. They were the only two, I think, who joined the judgment in full. I think that that means we don't consider Judge Edwards's dissent because you don't consider the views of a dissent from the judgment when you're trying to figure out the holding of the court. Do you agree with that, or do you think I'm kind of doing fractured opinion analysis wrong? I wouldn't want to give you an off-the-cuff response to that, Your Honor. It's a bigger question going beyond just this case. I haven't figured it out entirely. But I think I would think of it in this way. Judge Edwards says the reason this is not an open question in our circuit is because of national anti-hunger, where this court resolved a fair balancing claim on the merits. Now, he's wrong about that. You can just read national anti-hunger, and you know for a certainty those judges did not decide anything about justiciability. In that respect, Judge Friedman's opinion is identical to the majority opinion of national anti-hunger. They're relying on microbiological, but they're wrong if they're also wrong if, like, national anti-hunger didn't already establish this, you know, years earlier. Now, so on justiciability, sorry. Let me ask a question. The question, as I understand it, is whether there are even administrable standards in extreme cases. So let me offer you a hypothetical that I view as pretty extreme. I love hypothetical. But, so just imagine there's an EPA committee that is policy-focused. It's got 20 members, and you have people with all types of different expertise. But they are all from the Sierra Club, and they do similar work to what this committee does. Why can't a court step in and say, look, points of view represented. If it means something, it has to mean at least you have to have some representation from the different types of affected entities. And in this very extreme case, we're going to order you to redo this. So there's, at least in some sense, there are different points of view represented and not just functional balance. Would you concede that that is something a court could do? I guess I'd need to know more about the specific work of the policy committee and whether, you know, you've identified a degree of uniformity on one axis of membership of that committee. But is that necessarily relevant to the policy, the work of the committee? I don't know. I'd need to know more. This just goes to the point that there are nearly infinite perspectives one could take with regards to every policy issue under the sun. These are advisory committees whose sole point is to help the administrator reach a good decision, is to help the administrator in accomplishing his or her tasks. That person is best positioned to figure out what policies, sort of what their vision is, what kind of advice they need, and therefore, taking together lots of trade-offs, the court's not really qualified to consider, you know, what the composition is going to look like. And so, for example, in your hypo, it's going to look like, and any number of other issues. I do think it would be very odd for a court to ever mandate the composition, but I do think a court can say, when you have no plausible story at all about how there is a relevant diversity of points of view represented, you need to go reconstitute your committee. It's not entirely, LDF versus Barr is this hypothetical, on one view, Judge Bates's opinion there. And so these things do happen, and I don't see why a court can't step in in just those extreme cases. Again, I think that the types of perspectives that are going to best help the agency are for the agency to consider in the first instance. Congress reserved to itself the primary role in enforcing FACA compliance, saying, hey, we're going to make a continuing review of all of this. Congress did not supply any judicially manageable standards for the fair balance requirement. And finally, the EPA is trying to withstand judicial review of the final rule that it issued. This is not the end of the line here. The agency needs a good advice so that it can withstand the gauntlet of judicial review that always follows from the promulgation of the final air quality standard. So, I mean, we've addressed... Do you think NAACP was correctly decided by the district court? I'm sorry, Your Honor, I, as I stand here, I'm just losing... It's the one, everybody on the committee was a police officer, I think, or from the police community. And the district court said, well, that's not fairly balanced, because I guess all of us don't quite... I don't think it was correctly... Do you think it was correctly decided? Based on those facts, does that sound like... So, I guess, as I understand it, there was some sort of committee, they were all costs. Someone said you can't have all costs. It's harder for you, but... I wouldn't take the... I just think it's hard to say, look, anyone who's ever had that kind of a job, they all think... I mean, you all have the same job, you all think very differently from each other. The same is true for me and my colleagues. People have wildly divergent ultimate conclusions, sort of regardless of their institutional affiliations, very frequently. So, yes, we do think that these just cases just aren't justiciable, but we're not asking you to make huge law here. We should win under any applicable standard in this case. And again, that just goes back to Dr. Boyland, Dr. Chow, the actual committee members in this case. Dr. Boyland, who routinely dissents from, so far, six different analyses on six different ambient air quality standards. Just because you didn't have an opportunity in the briefing, do you have a response to the standing theory that was offered in the reply brief? Yes, I do, Your Honor. So, the theory they're relying on now is equal footing. They say they need to be considered on equal footing with every other applicant. That's exactly what happened here. I mean, the record is replete with evidence. This is 42, 250, 263, and 321 of the joint appendix, but all 100 applicants were evaluated according to the exact same metrics, and selections were made on the basis of the need to have a seven-person committee, fully staffed with all of the scientific perspectives needed to do a very big job in, you know, a broad range of factual areas. Those are the metrics under which they were evaluated. This is not like BACI, where the allegation, where the facts are, you know, some types of people get evaluated under one yardstick, and some types of people get a different yardstick. It's just not like that case. Therefore, it's not like the Colorado case. Let me ask you this, because you're certainly right, it's not a direct analogy, but it's similar in the following respect. The fundamental claim is, if you followed the law, I would have had X percent greater chance of being selected. And their theory here is, basically, you needed someone like me on the committee. BACA demands a set-aside for someone like me. You didn't realize that. But if you'd ran this process again, I would obviously have a better chance at securing this government benefit. But with respect, I'm not sure they're making an identity-based claim. They're not saying you need someone like me. Someone with this viewpoint. I'm trying to simplify it. Right, right, right. So there, it's just like, you and, crucially, there's no expectation of an appointment to any advisory committee. The statute and the GSA regs make it perfectly clear. It is wholly within the discretion of the appointing. Not like BACI, but is it like the Harvard College case? I guess I don't, I'm not immediately thinking of a distinction. I mean, they're both affirmative action cases where the allegation is, let's suppose there was clear evidence that the administrator chose half of the committee on the basis of race. Oh, we concede that would be just like BACI. That would be unconstitutional, right? We're not, no one's raised a constitutional claim here. We're not getting into that. I'm just saying there would be standing if there were the allegation where there's just different yardsticks. If a university can't give a bump to somebody because of their race, which is what Harvard College holds, then why should the administrator of EPA be able to do that? Oh, we're not saying that happened here? In the selection document, at least three or maybe more of the people were identified by their race as if that were a credential. So, your honor, I take those to be sort of by the way notations, but not a decisional criteria in those documents. I think that's clear from page 42 of the joint appendix, where the staff recommendation says we evaluated the 100 candidates on demonstrated competence, knowledge, and expertise in scientific and technical fields of air pollution and air quality issues, and that this committee is thus balanced. That's page 42. And the basis for recommendation, the basis for the staff's recommendation is listed, you see an example of this at page 48 of the joint appendix. Those are the grids where the staff goes through and analyzes the basis for the recommendation for each of the people who are being recommended. None of that, none of the material inside of that basis for recommendation grid lists anything about sex or race. So, it is not unusual for a decision maker. How did the staff know the race of the individual applicants? I guess I don't have information on, for you on that. What? I don't have information for you on that, your honor. I don't know. It's not reflected. If there are no further... If we think, if someone thinks EPA here considered race and gender based on the bullet points in the decision memo, do you have any argument that that does not render the selection process arbitrary and capricious? I think you might have suggested they could have brought a different type of constitutional claim or something like that. I'm not suggesting that. If they thought that that was what the evidence showed. But do you have an argument that it is permissible to consider demographic factors like that? We haven't raised that argument here. We're not asking you to decide that. Our sole argument on that point is that what did not happen. It was not a decisional criteria. Again, if I could just go through exactly why we think that is, there's the whole process for selecting these folks. It was very clear that the criteria are going to be what kind of scientific expertise do you bring to the committee? You see that from the email about the reconstitution of the committee where they say we're seeking nominations of experts in a variety of disciplines. You see that in the federal register listing where they say the You see that in the EPA staff evaluation of the candidates, quote, based on demonstrated competence, knowledge, and expertise in scientific areas. You see that in the Brennan declaration. This is the agency official who's in charge of all of this. Explaining further, yeah, we value these people on the basis of their scientific disciplines. And then, look, basically what they have is a press release saying, by the way, we're pretty proud of the diverse, of the gender and ethnic diversity, the folks we have chosen. But presidents of both parties have been proud of the diversity of the candidates they have chosen going back for decades that cannot yield a legal problem in the selection process. Thank you very much. Thank you. You are out of time, but we'll do two minutes. Thank you. Three quick points if I have enough time. First, on standing, the 10th Circuit has squarely addressed an individual's standing to address, to challenge a non-selection for violating a fairly balanced requirement under FOC. So, you agree, the government, that we don't have standing. We'll create a direct conflict with the 10th Circuit. I just want to emphasize, for purposes of our standing, the court assumes the truth of the merits of our merits claim. So, you have to assume the truth that there was a violation of the fair balance requirement. And under our theory of the case, had the government not violated that requirement, it would have been easier for our plaintiffs to be selected for the committee. And if you require them to redo the selection, they would have a better chance of being selected in the second round if EPA were establishing a fairly balanced panel. Second, on reviewability, neither Judge Silverman or, I think, Judge McFadden had the benefit of the Supreme Court's ruling in Department of Commerce, which clarified that Section 701 is an extremely narrow exception to reviewability, really confined to areas that are traditionally committed to agency discretion. And the court in that case found a very broad delegation of authority to the Secretary of Commerce to conduct the census was enough to provide law to apply. Here, you not only have standard in the statute, you have mandatory directive, shall, and you also have the benefit of the GSA regulations that fill in any gaps with respect to what fair balance might mean. What's the overlap, if any, the overlap, if any, between that APA provision and just general Article III political question on justiciability inquiries? I think those are separate considerations. Congress in Section 701 created two exceptions to reviewability. I'm only talking about the second one here about matters that are committed to agency discretion. The Supreme Court has said that's areas like prosecutorial discretion or where there's really no law to apply. It all collapses into the question of whether there is law to apply either way. Physicians for Social Responsibility kind of makes that clear. And again, if the court previously relied on Subpart A of the GSA regulations for law to apply, this court can also rely on Subpart B. And if you disagree with us on reviewability and agree with the government, this would be a direct conflict with the Fifth and Tenth Circuits on reviewability. Finally, just to wrap up, our APA claim is probably the easiest way to resolve this case because there is no contemporaneous explanation in the record for why this committee is fairly balanced. Thank you very much. Thank you.
judges: Walker, Garcia, Randolph